UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Docket No.: 2:19-cr-67-DBH |
| | ) | |
| JESSICA CHILDS | ) | |
| Defendant | ) | |

**MEMORANDUM OF LAW
IN AID OF SENTENCING**

Here comes the Defendant, Jessica Childs, by and through the undersigned counsel, and respectfully submits this Memorandum of Law in Aid of Sentencing to assist the Court at Defendant's upcoming Sentencing Hearing scheduled for January 8, 2020.

**I.    Background**

While Jessie's crime here is substantial and egregious, her remorse for the same is equally immense. In fact, in November 2015, after her crime was discovered, Jessie Childs swallowed all of her prescription medications; she walked into the Kennebec River, determined not to walk out again. The freezing water climbed to her waist. The current was so fierce, it nearly pulled her straight down. She decided she would just float down the river until it swallowed her; the coldness of water took her breath away. It made her toes numb; soon she could not feel her legs, her body. Fortunately, her mind was no longer numb. She thought of her children, her husband, her friends at Women's Unlimited, her shame, her remorse. Tears streamed down her face as she shivered freezing in the water.  Suddenly, she realized that she could not go through with it. That she could not take this way out and leave everyone around her to suffer even more consequences because of her actions. She had to face it. She tried to swim in; but the current was so strong she could barely move.  Nonetheless, Jessie forced her way to the shore and her car, and called 911. She admitted

1

herself to the psychiatric hospital. She began treatment. After so many wrongs, Jessie Childs began to do the right thing.

### a. The Fraud

Jessie spent her childhood in a web-spun lie that spanned to her family members and neighbors, with everyone "in the know" but her. Her parents were severe alcoholics and Jessie suffered with their addiction. She worked hard in school as her only escape from the stress, alcohol, abuse, and deceit. Her mother showed no inclination towards love, warmth or kindness and repeatedly chose alcohol and men over Jessie. And although Jessie survived her childhood, she did not escape unscathed.

Women's Unlimited was both a dream job and a curse for Jessie. The dream was working on an important cause with people she cared about, even loved. CEO Lib Jameson became like the mother Jessie never had; someone who actually depended on her, trusted her, and even cared for her. Unbeknownst to Jessie, however, the stress and her untreated childhood traumas, became too much for her. As she began to take on more and more responsibility at work, often left with the task of essentially running the company, the stress became too much. Instead of turning to drink like her parents had before her, however, she turned to fraud. First it was just a little here and there to help pay this bill or that—to get a small amount of breathing room and in the meantime feel as if she was exercising some control when everything else felt like it was spinning. Soon the fraud took on a life of its own, consuming her every waking moment as she tried to keep it in check, determined she would somehow pay it all back before it was noticed. Her deceit was tragic and, while it may have seemed inexplicable, to Jessie's traumatized and ill mind, it was also pre-ordained in some way: Jessie's destiny, at least according to what her mother had told her all her life, to be a worthless and troublesome being who ruined the lives of those around her and those whom she most loved was finally coming to fruition.

The conscious Jessie thought she would repay her debts, and that her employer and friends would escape her fraud unscathed. But the fraud continued and with each passing day the web of lies got bigger and bigger in order to keep the scheme afloat. People were hurt and, finally, Jessie was exposed. Her regret, shame and fear was so great that she attempted to take her own life. Indeed, she got very close—so close as to be floating down the Kennebunk River on a cold November day—but she fought her way back. She faced her family and her friends and she now faces the Court and the victims of her actions, accepting full responsibility for everything she has done.

### b. Personal History

Jessie grew up as an only child to Wayne Bailie and Margaret Parker. Throughout her youth, her parents were chronic and severe alcoholics. Jessie witnessed many iniquities related to their alcoholism, including domestic abuse. Her father was arrested no less than three times for driving while intoxicated. Young Jessie was a *passenger* in the car during two of these arrests. As a child Jessie saw her mother, intoxicated and screaming with rage, attack a police officer and get arrested. Jessie walked in on her father having sexual relations with another woman in their home. Jessie witnessed her father, in a drunken rage, grab her beloved kitten and throw it out the window where it landed on the lit grill and died.

Jessie's mother was cold, distant and cruel to Jessie. She treated Jessie as worthless and frequently told her she was so.[1] When Jessie was 15 years old her mother dropped her off at a sleep-over a Jessie's best friend's home. As Jessie opened the car door to get out, her mother casually turned, looked at her with disdain, and informed her that Wayne was not her real father. She told Jessie that in fact Earl, her best friend's father, was Jessie's biological dad and everyone knew except Jessie. Then her mother just drove away. Jessie soon learned that, in-fact, almost everyone else in her

---

[1] Her mother has since been diagnosed with bi-polar disorder, but this was not diagnosed at the time. Jessie has little to know contact with her mother now.

family and community had known about Earl – everyone except her. Earl also was a drunk and a ne'er-do-well. Jessie was devastated and had no outlet for her grief of confusion. Looking back Jessie realizes that at that impressionable age she felt that her life to that point was a fraud; Jessie then understood herself to be a fraud and to be the worthless creature her mother claimed she was. Only after her crimes here, and choosing to face the consequences of her actions, is Jessie now realizing that she does not have to fulfil her mother's prophecy.

Jessie turned to school, feeling that was the only escape. She never developed any relationship with her biological father. Her mother continued to treat her with disgust and disdain. Knowing no better, Jessie felt more and more that this horrible treatment was deserved.

Finally, when Jessie was around 17 years old, her father Wayne got himself sober. He remains so to this day. Jessie's mother, however, had no intention of becoming sober and did not like Wayne being so. She separated from Wayne. Teenager Jessie continued to live with her mother. Their rolls flipped—Jessie became the parent, trying to keep her mother safe and help her stay out of trouble. Unfortunately, this was to no avail. The very day that Jessie's mother and Wayne's divorce became official, Jessie's mother married Tim, whom she had had met online. Tim was just 19, nearly the same age as Jessie herself.

Unsurprisingly, Tim had entered Jessie's mother's life for deceit. He took advantage of her mother financially and emotionally. Jessie watched Tim manipulate and make a fool of her mother over and over. When she learned that Tim was cheating on her mother too, Jessie told Tim to get out of her mother's house. Jessie's mother became infuriated that Tim was gone, and blamed Jessie for his departure. Jessie's mother then became severely depressed and attempted suicide. Jessie tried to help and, because she could not help, to stay out of the way.

Jessie eventually was able to leave her mother's house and go to college. Her father had stayed sober and apologized to Jessie for his past behavior. Jessie knew his remorse was sincere, appreciated

his ability to apologize, and forgave him. Their relationship is strong and he remains a loving and stable presence in Jessie's life.

**C. Current Family History**

Jessie met her husband, Brent Childs, 18 years ago and they have been married for 17 years. He was also a victim of Jessie's crime, blind-sided when the truth came out. Brent has since watched Jessie's hard work to get help for her emotional illness, and watched her struggle these past 4 years with her crushing remorse and efforts to atone.

The stress has affected all their lives. Just weeks before sentencing was originally set in this matter in October 2019, the stress got too much for Brent and he suffered a heart attack and was hospitalized. He thankfully recovered, but the anxiety on all involved is undeniable. Brent continues to have to take great care with his stress levels and his health remains at risk. Jessie's remorse and self-punishment grows as she sees her family continue to suffer for her crimes.  More so because she knows the other victims are also suffering in the same way.

Jessie and Brent have two children, S and J.[2] J is a full-time student. J is aware that his mother has pled guilty and is pending sentencing. His support of and love for his mother is unwavering. S is a teenager who lives with her parents. She also knows what has happened with her mother. S is extremely close to her mother and these events have been devastating to her.

As reflected above, On November 2, 2015, Jessie consumed all of her prescription medication and walked into the Kennebec River with the intent to take her own life. Thankfully her spirit intervened and she managed to get out of the river and call 911. From there, she was taken to the emergency room and admitted into Spring Harbor hospital. Jessie remained in acute mental care at the hospital for 6 days before discharge. She then attended and completed an intensive outpatient

---

[2] To avoid naming the children, one of whom is a minor, in this publicly filed document, counsel will use their first initials.

5

mental health program. She also began to see a psychologist, Barbara Cummings, on a weekly basis. The frequency of that treatment was later reduced to bi-weekly, monthly and then on an as-needed basis.[3]

In the early stage of that treatment, Jessie was diagnosed with major depressive disorder and obsessive-compulsive disorder. Dr. Cummings reported that Jessie suffered from a significant amount of anxiety and had experienced a "chaotic, abusive childhood household." She noted that Jessie felt "hopeless, worthless and anxious."

Jessie's treatment goals included resolving her suicidal ideations and examining her childhood trauma and how it impacted on her current functioning. Another goal was for Dr. Cummings to help Jessie understand why, in committing the instant offense, she had behaved in a way that was so inconsistent with her values. It was only after working extensively on her mental health that Jessie was able to see that, in addition to her mother's alcoholism, her mother and maternal grandmother also undoubtedly suffered from a myriad of mental health ailments, such as depression, anxiety, agoraphobia, possible bipolar disorder, suicidal ideations and post-traumatic stress disorder.

Records show that during the extended period of time Jessie has been in treatment, she acknowledged repeatedly feeling great remorse about her wrongful actions. True to form, Jessie expressed real concern about the negative impact that her actions would have on her family, and was less concerned with her own outcomes. Dr. Cummings has provided the Court with a letter that details these challenges and their impact on Jessie and her actions.

## II.     **Application of the Section 3553 Sentencing Factors**

This Court is tasked with imposing a sentence on Jessie and, although, a Guideline Sentencing Range must be calculated, this range is no longer binding on the Court. *United States v. Booker*, 543

---

[3] Recognizing the potentially triggering nature of the impending sentencing, Jessie initiated more regular meetings with her therapist – a sign that she now knows how to take care of herself and her mental health needs.

U.S. 220 (2005); *Gall v. United States*, 128 S.Ct. 586 (2007); *Kimbrough v. United States*, 128 S.Ct. 558 (2007). Instead, the Court must impose a sentence that is sufficient but not greater than necessary to serve the purposes listed in 18 U.S.C. §3553(a). There are many factors in this case that support a substantial variant sentence, including Jessie's traumatic family history, her own mental health struggles, her family—and in particular her minor daughter's—needs, her pretrial cooperation and early restitution payment, the lengthy amount of time that has passed since the end of her criminal activity, and her current hard-fought employment that has enabled further restitution payments to escrow pending sentencing.

### A. Family History

Jessie's family history as described above, her own mental health issues, and her hard work and achievements on her mental health, suggest that a substantially variant sentence is appropriate in this case. While not an excuse for her crimes, the Court must consider the substantial role her upbringing and her mental health had on her crimes. In doing so, it should also look to the substantial progress she has made to address these issues to assure they never again arise. The Court should consider her volunteer work in the school system and the serious needs of her daughter, as well as Jessie's attitude and the attributes that lead her to continue to try over and over to secure employment in order to begin to continue her family and restitution obligations.

### B. Criminal History and Pretrial Compliance

Jessie's lack of criminal history is an important factor for the Court to consider at sentencing. She is not only a criminal history category I, but she is a true first-time offender. As this Court knows, true first-time offenders rarely appear before it. This is particularly true in Jessie's case where her first offense did not occur until she was almost 40 years old. This factor combined with her substantial work on the mental health issues that contributed to her crime, is good evidence that she is unlikely to commit any further crimes.

Jessie has known of the likelihood of a criminal investigation since very early on in this matter. Initially an assumption, the Government specifically stated its plans to investigate years ago. Jessie was fully compliant with this investigation at all times, and in April 2019 plead guilty by way of Information. At that time, she was determined to be a minimal risk by the Court. Resultantly, she was released on a personal recognizance bond with pretrial supervision. Over these last nine months, she has fully complied with all of her release conditions.

In fact, at the time of her plea, Jessie voluntarily self-reported the instant offense to her then-current employer, Staples. When doing so, she was fully aware of the possibility that doing so likely would result in her being terminated from her position of General Manager. However, she was determined that her life should be free of deceit and so she reported to her employer. Although an automatic internal investigation found no infractions or instances of misconduct of any kind during her three years of employment with Staples, company policy mandated her termination after she self-reported her crime and guilty plea.

Jessie's offense ended in October 2015, over four years ago. During those four years, Jessie has worked hard at making positive changes in her life and facing the consequences of her crime. As soon as her mental health care providers deemed her ready, she began to look for work. She was able to secure a job at Staples to help support her family and to begin to pay back the loans she took out to pay the WU restitution. She was exceptional in that job, despite her continued hard work on her mental health issues and the stress of the criminal investigation. At Staples, she was promoted no less than three times in 3 years, rapidly ascending to the position of General Manager.

After Jessie pled guilty and Staples terminated her, she was gutted again. Her family needed her income for support and to pay back the loans for her prior restitution payment; she needed to be a productive member of society, as well as money for additional restitution that she knew was forthcoming. And so, even with sentencing set for just a few months later, Jessie began to apply again

for work. She applied over and over and was rejected over and over; before she landed her current job she had sent out of 50 different job applications. Finally a recruitment officer at Target posted a position. She applied and made it to the interview stage. She again was honest with the recruitment officer about her crime and guilty plea.[4] She was hired and finally began working for Target at the beginning of November 2019. Jessie anticipates that if she goes to prison for a lengthy period of time, she most certainly will lose her employment. Her hope is that a shorter prison term might allow her to keep her position.

The combination of these factors is noteworthy and extremely rare compared with the vast majority of defendants who appear before this Court. Accordingly, we urge the court to give them strong consideration when determining what level of punishment is appropriate in this matter. We also ask the Court to consider the length of time that this matter has been pending—over four years. While many factors contributed to this delay, including extension requests from Ms. Childs due to her husband's recent heart attack and other matters, the stress of this case looming over her has been a constant source of anxiety, and has been a punishment in and of itself. Like the proverbial albatross, Ms. Childs has carried her sincere remorse and extreme guilt around with her these past several years. While the victims here undoubtedly also feel great stress from their delayed sense of justice, the same maxim applies to Jessie.

    **C.**    **Cooperation and Early Payment of Restitution**

Immediately after the discovery of her crimes in October 2015, Jessie began cooperating with the internal investigation into her wrongdoing. She went into Women's Unlimited and worked with the analyst to attempt to reconstruct her fraud to show them where the money went. This was before court involvement, before police involvement, before counsel involvement. Most defendants are unwilling to act in such a responsible manner, probably because it would require them to

acknowledge their illegal behavior even before criminal charges had been brought. Jessie knew this, but she also knew that she had to finally begin to do the right thing. Since October 2015, Jessie has tried to squarely face the consequences of her actions.

Further along those lines, Jessie made arrangements to pay $60,000 of restitution to WU immediately. As this Court knows, it is almost unheard of for an individual to make such a significant amount of restitution to the victim prior to the commencement of the criminal case. Jessie made restitution payments without the benefit of any forensic analysis from WU. The parties agreed to an amount of $60,000 at that time, knowing the amount could increase.[5] The payment of a substantial amount of restitution is certainly noteworthy, particularly when compared to most defendants who appear before this Court.

Moreover, Jessie recently secured yet another job in the hopes of being able to make continued restitution payments. She has begun sending money to counsel to hold in an escrow account pending sentencing. By the date of sentencing, she will have approximately $800 in additional restitution, which constitutes about $100/week from her paycheck since she secured new employment in November 2019. She plans to increase this amount after sentencing should she be able to continue with her employment. Jessie and her family took loans in order to pay off the original $60,000 in restitution, and continue to pay on those loans. Jessie is determined to make amends in any way she can. The unfortunate fact of the matter is that if Jessie is incarcerated and unable to work, she will be unable to pay any further restitution during that time and likely for some time thereafter considering the length of time it took her to secure employment after the plea. Now, with an actual felony conviction for fraud, finding employment will be even harder.

---

[5] At the time WU believe the fraud amount was significantly higher, but did not have the ability to share the forensic information with Jessie at that time. The parties therefore agreed on a sum of $60,000.

### III.  Conclusion

The defense recognizes that this is a difficult case regarding sentencing. Jessie committed a fraud that lasted years and did it, no less, against those that trusted her most. She makes no excuses for her actions. She offers only sincere apologies and a desire to continue to try to make things right through restitution and hard work. She hopes that one day her former co-workers and friends can find a way to forgive her. As this is a Class B felony, the Court is required to impose a sentence of incarceration.

Jessie asks that after the Court has thoroughly reviewed all of the factors in this case, it impose a variant sentence substantially below the guideline sentencing range. *Booker, Gall, Kimbrough* and their progeny, and the requirement of 18 U.S.C. §3553(a) dictate that a sentence must be sufficient but not greater than necessary "to achieve the purposes of punishment." Jessie's crime was egregious and must be punished. A lengthy incarcerative sentence, however, will not be an appropriate punishment in this matter. First, any term of imprisonment will delay the remainder of the restitution that Jessie owes, this is particularly true if the term means that Jessie is terminated from yet another job. But, perhaps most significantly is that a lengthy prison sentence will have devastating effects on Jessie's family and particularly her vulnerable minor daughter. Jessie asks that the Court impose a one-month sentence, followed by a lengthy period of home confinement of 14 months, for a total sentence of 15 months. The idea of even this period of incarceration terrifies Jessie, although she understands why she deserves such a sentence. This time in prison followed by 14 months of home confinement will be a severe punishment that in this instance will capture the needs for general and specific deterrence, as well as retribution. It will also consider the many mitigating factors at play here, as well as the concepts of rehabilitation which the Court should also consider here in light of Jessie's exceptional behavior in these 4.5 years following her criminal

activity. Such a sentence contemplates the particularly fragile mental health of Jessie's teenage daughter and allows for Jessie to continue to pay back the restitution outstanding in this matter.

|  |  |
|---|---|
| Dated: January 2, 2020 | /s/ Stacey D. Neumann<br>Stacey D. Neumann, Esq.<br>sneumann@mpmlaw.com<br>MURRAY PLUMB & MURRAY<br>75 Pearl Street, P.O. Box 9785<br>Portland, ME  04104-5085<br>(207)773-5651<br>(207) 773-8023 (Fax)<br>*Attorney for Ms. Childs* |

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed this *Sentencing Memorandum* with the Clerk of Court using the CM/ECF System which will send notice of such filing to all parties of record. This document is available for viewing and downloading from the CM/ECF System.

Dated: January 2, 2020                                /s/ Stacey D. Neumann

                                                       Stacey D. Neumann, Esq.
sneumann@mpmlaw.com
MURRAY PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207)773-5651
(207) 773-8023 (Fax)